[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 04, 2010
JOHN LEY
CLERK

No. 09-11848
Non-Argument Calendar
_____

D. C. Docket No. 07-60230-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CARLOS DIAZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 4, 2010)

Before TJOFLAT, BIRCH and WILSON, Circuit Judges.

PER CURIAM:

Carlos Diaz ("Diaz") appeals his convictions and sentences for conspiracy to

possess with intent to distribute five kilograms or more of cocaine, 21 U.S.C. §§ 841(a)(1),(b)(1)(A), 846 (count one); attempt to possess with intent to distribute five kilograms or more of cocaine, 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846 (count two); and carrying a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A) (count three). The district court sentenced Diaz to concurrent terms of 160 months of imprisonment on counts one and two, and a consecutive term of 60 months of imprisonment on count three. After thorough review of the record and briefs, we AFFIRM his convictions and sentences.

## I. BACKGROUND

In April 2007, Carmello Crespo-Dones ("Crespo-Dones") and Diaz met with two confidential informants, including Gildardo Zapada ("Zapada"), to discuss the purchase of ten kilograms of cocaine. R11 at 120-21, 125-26. When Zapada questioned the unexpected presence of Diaz at the meeting, Crespo-Dones reassured Zapada that Diaz was a friend and a drug dealer with many contacts who would be useful for future deals. Id. at 128. Diaz took an active role during the meeting. He requested a price reduction and suggested that the drug sale be broken into two transactions. Id. at 129. The deal ultimately fell through, however, because Diaz and other potential purchasers believed it was too risky. Id. at 134.

Diaz later informed Zapada that he would be his contact for any future drug

deals. Id. at 137. Diaz emphasized that he was very careful in his drug transactions, he always carried a gun, and he would shoot anybody if something went wrong. Id. at 139. Diaz told Zapada about a potential buyer in New Jersey. Id. at 139-40, 142. Diaz gave Zapada his phone number and told him he would "keep in touch." Id. at 142. A few weeks later, Diaz called Zapada to see if he could purchase two to four kilograms of cocaine, but Zapada insisted that the minimum was ten kilograms. Id. at 143-44.

Throughout the summer, Zapada received several phone calls from Crespo-Dones about purchasing the ten kilograms of cocaine. Id. at 146. At the end of August 2007, Crespo-Dones advised Zapada that Diaz had most of the money ready and would contact Zapada within the next few days. Id. at 145-47.

On 1 September 2007, Diaz called Zapada and stated his New Jersey buyer had come to Miami to purchase the drugs. Id. at 148. On 4 September, Diaz met with Zapada at a restaurant in Hialeah, Florida. Id. at 148-49. Diaz showed Zapada his gun, stated he does not play games, and reiterated that he would shoot everybody if necessary. Id. at 150. Zapada believed Diaz and felt afraid. Id. Diaz advised that he had personally seen the money but his New Jersey contact was concerned about making such a large purchase. Id. at 151. After further negotiations with Diaz, Zapada agreed to sell seven kilograms of cocaine for

3

$120,000, with the final three kilograms being transacted at a future date. Id. at 151-52. Over the next few days, Diaz and Zapada hammered out the details of the transaction. Id. at 155.

On 7 September, Diaz arrived at the designated meeting place with two other men, Dexter DeBernard and Eduardo Perez.[1] Id. at 201-02, 206. Diaz entered the restaurant with DeBernard and introduced him to Zapada as "the money guy" from New Jersey. Id. at 156, 203. Although DeBernard expressed concern that Zapada might be a cop, DeBernard and Diaz eventually agreed to return to the restaurant with the money in an hour. Id. at 157-58. Upon their return, Zapada got into their vehicle and inspected a plastic bag of money. Id. at 160. Zapada then exited their vehicle so that they could go to his apartment to retrieve the cocaine. Id. at 160-61.

Shortly thereafter, officers of the Sunrise Police Department conducted a traffic stop of the suspect vehicle and obtained consent to search it. Id. at 207-08, 227-29. The officers recovered from the vehicle a plastic bag containing $113,330 in cash, packaged in "quick count bundles" of $1000 increments. Id. at 208-09, 216. Prior to the bag being opened, Diaz informed one of the officers that it was "just a bag of clothes." Id. at 230. An officer also confiscated a loaded handgun

---

[1] Both men were indicted with Diaz as co-conspirators. R1-1.

4

from Diaz's waistband.  Id. at 209, 230-31.

In his defense, Diaz testified that a 2005 motorcycle accident had resulted in traumatic brain injuries and a total loss of memory.  Id. at 241-43.  Diaz further stated that when he hears three or more voices, "[i]t becomes like a whisper and my eyes get dizzy and my head starts spinning."  Id. at 243.  While Diaz admitted meeting with Zapada and Crespo-Dones on multiple occasions, he insisted he had no intent to participate in any drug transactions.  Id. at 245-49.  He explained that his gun was not for criminal purposes but for self-protection because he lived in a rough neighborhood.  Id. at 250.  When confronted with his post-arrest statement that he was being paid $500 per kilogram of cocaine, Diaz responded, "Well, the truth, the truth about that was that I never really discussed price with Mr. [De]Bernard."  Id. at 251.  Diaz further asserted that he was "not a hundred percent" mentally.  Id. at 253.  He admitted that he knew what he was doing, but testified that "I didn't have a full understanding of everything, and I was easily used to do a crime.  But not because I chose to."  Id.

On appeal, Diaz raises multiple issues related to four general topics: sufficiency of the evidence as to each conviction, the district court's evidentiary rulings, cumulative error, and multiple sentencing errors.  We address each one in turn.

5

## II. DISCUSSION

A. <u>Sufficiency of the Evidence</u>

We review <u>de novo</u> whether there is sufficient evidence in the record to support a jury's verdict. <u>United States v. Maxwell</u>, 579 F.3d 1282, 1299 (11th Cir. 2009). We will affirm if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." <u>Id.</u> (quotation marks and citation omitted). All credibility choices and conflicts in the evidence must be resolved in the government's favor. <u>See</u> <u>id.</u>

1. Count One

Diaz was charged in count one with conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1),(b)(1)(A), 846. To establish a conspiracy, the government must prove that an agreement existed between two or more persons to commit a crime and that the defendant knowingly and voluntarily joined or participated in that agreement. <u>United States v. Seher</u>, 562 F.3d 1344, 1364 (11th Cir. 2009). The knowledge component is satisfied if the defendant was aware of the conspiracy's primary purpose. <u>Id.</u> Evidence of the agreement can be purely circumstantial, and may include inferences based on the alleged participants' conduct. <u>Id.</u>

Here, there was ample evidence demonstrating that Diaz knowingly and

voluntarily participated in the charged conspiracy. According to Zapada's testimony, Diaz bargained over both the price and quantity of cocaine during their first meeting. It was in part Diaz's decision not to complete that deal because he believed it was too risky a purchase. Diaz continued to take a pivotal role in subsequent drug negotiations, acting as Zapada's contact and securing the New Jersey buyer. Furthermore, it was Diaz who negotiated the final terms of the cocaine purchase, arranged the details of the transaction, initially inspected the purchase money, and ultimately met with Zapada and DeBernard to execute the drug deal.

Although Diaz testified that he was merely present at the meetings and had no intent to participate in any drug transactions, the jury chose not to credit his testimony. "We have recognized that a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt." United States v. McDowell, 250 F.3d 1354, 1367 (11th Cir. 2001) (quotation marks and citation omitted). Consequently, the jury could reasonably conclude from Diaz's non-credible testimony that he had the requisite guilty knowledge and intent to participate in the drug conspiracy. See id. (explaining that the jury was free to infer from appellants' false statements that they knew and intended to import cocaine). Viewing the evidence in the light most favorable to the verdict, we

7

conclude that there was sufficient evidence to support Diaz's conviction of conspiracy in count one.

2. Count Two

Count two charged Diaz with attempt to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846. A person is guilty of attempt if he has the specific intent to commit the underlying crime and he took actions that constituted a "substantial step" toward the commission of that crime. United States v. Yost, 479 F.3d 815, 819 (11th Cir. 2007) (per curiam). "A substantial step can be shown when the defendant's objective acts mark his conduct as criminal and, as a whole, strongly corroborate the required culpability." Id. (quotation marks and citation omitted).

The evidence at trial reveals sufficient evidence that Diaz had the specific intent to commit the underlying crime at issue and that he took substantial steps to initiate, facilitate, and execute the purchase of seven kilograms of cocaine. As previously discussed, Diaz had multiple discussions with Zapada about purchasing cocaine, introduced Zapada to a cocaine buyer, and negotiated the terms of the final deal. The fact that Diaz was arrested before the deal was consummated is immaterial. See United States v. Rodriguez, 765 F.2d 1546, 1552 (11th Cir. 1985). Moreover, based on the quantity of drugs involved, the jury could reasonably

8

conclude that Diaz intended to distribute the cocaine. See United States v. Hernandez, 433 F.3d 1328, 1333 (11th Cir. 2005) (concluding that a jury may infer a defendant's intent to distribute two kilograms of cocaine based on the amount of narcotics involved). While Diaz argues he only intended to act as a broker by introducing the parties, a broker can still be found guilty of possession with intent to distribute cocaine. See Rodriguez, 765 F.2d at 1551-53 (affirming drug conspiracy conviction for defendant who acted as a broker by placing a government agent into contact with a drug source). We thus find ample evidence to support Diaz's conviction of attempt on count two.

3. Count Three

Diaz was convicted in count three of carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Diaz concedes on appeal that if we affirm his convictions on counts one and two, then he is guilty of count three. In light of our affirmance of his convictions on counts one and two, we find sufficient evidence to support his conviction on count three as well.

B. Evidentiary Rulings

Diaz next argues that the district court erred by admitting various evidence that prejudiced his case. We review a district court's evidentiary rulings for abuse of discretion. United States v. Docampo, 573 F.3d 1091, 1096 (11th Cir. 2009),

9

cert. denied (U.S. Apr. 5, 2010). Even if we find an abuse of discretion, we will not reverse the conviction if the error was harmless. Id.

1. Leading Question

Diaz first challenges the court's ruling on a leading question. During direct examination of Zapada, the following exchange took place:

> [PROSECUTOR]: Who is that individual that was going to buy 10 kilos of cocaine?
>
> [ZAPADA]: I know him as Carmello.
>
> [PROSECUTOR]: Carmello Crespo-Dones?
>
> [ZAPADA]: Yes.

R11 at 125. Diaz objected to the question as leading, and the court overruled his objection. Id. On appeal, Diaz contends that without this leading question, it is possible Zapada was testifying about someone else.

Federal Rule of Evidence 611(c) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." Fed. R. Evid. 611(c). Here, the government's question was necessary to clarify that Zapada was referring to Carmello Crespo-Dones in order to avoid the very misidentification that Diaz highlights. The district court did not abuse its discretion in permitting this question.

2. Zapada's Testimony About Crespo-Dones' Statements

10

Diaz asserts that Zapada's testimony as to statements made by Crespo-Dones constituted impermissible hearsay. Specifically, Diaz challenges Zapada's testimony that Crespo-Jones introduced Diaz as a friend and drug dealer. Diaz also objects to Zapada's testimony that Crespo-Jones called Zapada at the end of August 2007 and said that Diaz was almost ready to execute the drug deal.

The district court admitted Zapada's testimony about Crespo-Dones' statements under Federal Rule of Evidence 801(d)(2)(E). R11 at 128, 145. This rule allows statements of a co-conspirator if the government proves by a preponderance of the evidence that a conspiracy existed, the conspiracy included the declarant and the defendant, and the statement was made as part of the conspiracy. See United States v. Underwood, 446 F.3d 1340, 1345-46 (11th Cir. 2006).

We find no abuse of discretion in this matter. The evidence established that Crespo-Dones conspired with Diaz to purchase cocaine from Zapada. Crespo-Dones introduced Diaz as a friend and a drug dealer in order to reassure Zapada that Diaz was knowledgeable about their intended drug transaction and would be useful for future drug deals. Likewise, Crespo-Dones called Zapada during August 2007 to report on Diaz's progress in securing the drug purchase money. Both of Crespo-Dones' challenged statements were made in furtherance of the drug conspiracy.

11

Accordingly, Crespo-Dones' statements were admissible under Federal Rule of Evidence 801(d)(2)(E) as statements by a co-conspirator in furtherance of a conspiracy. See id.

Diaz further asserts for the first time on appeal that admission of Crespo-Dones' statements violated his Sixth Amendment right of confrontation because Crespo-Dones did not testify. Our review is limited to plain error as Diaz did not raise a constitutional objection in the district court. See United States v. Arbolaez, 450 F.3d 1283, 1291 (11th Cir. 2006) (per curiam). Diaz must therefore demonstrate that an error occurred, it was plain, it affected his substantial rights, and it "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." Id. (quotation marks and citation omitted).

No error, plain or otherwise, has been shown. Although the Confrontation Clause prohibits the admission of "testimonial" statements unless the witness is unavailable and there was a prior opportunity for cross-examination, the Clause does not bar the admission of non-testimonial statements. See Crawford v. Washington, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004). The Supreme Court has noted that statements in furtherance of a conspiracy are "by their nature . . . not testimonial." Id. at 56, 124 S. Ct. at 1367.

We have likewise held that a co-conspirator's statements to a confidential

12

informant, which are admissible under Federal Rule of Evidence 801(d)(2)(E), are not "testimonial" and thus do not violate a defendant's Sixth Amendment confrontation rights. Underwood, 446 F.3d at 1347-48. We explained in Underwood that a co-conspirator's recorded conversations "clearly were not made under circumstances which would have led him reasonably to believe that his statement[s] would be available for use at a later trial." Id. at 1347. Had the co-conspirator known the true identity of the confidential informant, he would never have spoken to her in the first place. See id.

The same holds true here. When Crespo-Dones referred to Diaz as a drug dealer or discussed the purchase of drugs, Crespo-Dones did not anticipate that his statements would be used at some future trial. Nor would he have made the statements if he knew that Zapada was a confidential informant. As such, Crespo-Dones' statements were not "testimonial" in nature and their admission did not violate Diaz's Sixth Amendment confrontation rights. See id.

3. Zapada's Testimony That He Felt Afraid

Diaz contends that the district court should have excluded as irrelevant Zapada's testimony that he felt afraid when Diaz displayed his gun. We disagree.

Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action" more or less probable. Fed. R.

13

Evid. 401. Here, count three charged Diaz with carrying a firearm during and in relation to a drug trafficking crime. Diaz asserted in his opening statement that he carried a firearm for personal safety because of his neighborhood. In anticipation of this defense, Zapada testified that Diaz displayed his gun during their final drug meeting and reiterated his previously-stated intent to "start shooting everybody" if anything went wrong. R11 at 150. Zapada's testimony that he felt afraid was relevant to show that Diaz was carrying his gun for the purpose of protecting himself during the drug deal, not because he lived in a rough neighborhood. Because Zapada's testimony was relevant to establish count three and to rebut Diaz's anticipated defense, the district court did not abuse its discretion in overruling Diaz's objection.

4. Zapada's Testimony About Recorded Conversations

Diaz alleges that the district court improperly allowed Zapada to testify about his recorded conversations with Diaz and Crespo-Dones. Because no recordings or transcripts were admitted, Diaz contends that Zapada's testimony was untrustworthy and prejudicial.

We find no abuse of discretion. Diaz objected to Zapada's testimony about "conversations that are memorialized on these CDs that are all in Spanish," but he gave no basis for the objection. Id. at 153. On appeal, Diaz cites no legal precedent

14

for the proposition that a witness cannot testify about a recorded conversation if the recording or transcript of the recording is not introduced. The sole case he cites cuts against him, as it explains that Federal Rule of Evidence 602 permits a witness to testify about a matter within his personal knowledge. See United States v. Castro, 89 F.3d 1443, 1454 (11th Cir. 1996). This rule would apply here. No abuse of discretion has been shown.

5. Diaz's Motives for Trial

At trial, Diaz was asked by his attorney why he chose to go to trial. Diaz responded that, "I didn't really choose to go to trial. I mean, I had a lawyer who really didn't want to help me in the beginning. He had me – " R11 at 253-54. The government objected and the court sustained the objection on the grounds that Diaz's reasons not to go to trial or his communications with a lawyer were not relevant. Id. at 254. On appeal, Diaz submits his testimony was relevant to the truthfulness of his testimony about his confession.

Diaz's argument is without merit. Diaz was permitted to testify that he was coerced into confessing and to explain his reasons for wanting to testify at trial. Id. at 252-53. Diaz does not specify on appeal what further information he would have provided in response to the challenged question that would have been relevant to the veracity of his police interview. Nor does Diaz identify any other material fact

15

that would have been made more or less probable by his testimony regarding his motives for trial. See Fed. R. Evid. 401. We therefore conclude that the district court did not abuse its discretion in ruling that Diaz's reasons for choosing to proceed to trial were irrelevant.

C. Cumulative Error

Diaz maintains that the cumulative effect of the district court's putative errors discussed in Section IIB warrant the grant of a mistrial.

We have recognized that "the 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible." United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005) (per curiam) (quotation marks and citation omitted). Of course, the absence of any individual error precludes the existence of any cumulative error. See United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004) (per curiam) ("'If there are no errors or a single error, there can be no cumulative error.'"). Having found no individual error by the district court, we also reject Diaz's claim of cumulative error. See id.

D. Sentencing Errors

In his final argument, Diaz raises the following challenges to his sentence: (1) the district court erroneously denied a minor role reduction; (2) the district court

16

erroneously denied a downward departure for diminished capacity; (3) the district court erred in ruling that his sentence for count three should run consecutively to his sentence for counts one and two; (4) the district court erroneously applied a two-level enhancement for obstruction of justice and violated Diaz's Sixth Amendment right to a jury trial; and (5) the district court erroneously denied a request for a variance under 18 U.S.C. § 3553, which resulted in an unreasonable sentence.

We review a sentence for both procedural and substantive reasonableness under a deferential abuse-of-discretion standard. See United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008). To be procedurally reasonable, the sentence must be properly calculated under the advisory Sentencing Guidelines and reflect consideration of the sentencing factors under 18 U.S.C. § 3553(a).[2] See id. A

---

[2] These factors are as follows:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range . . .;

sentence is substantively reasonable if, under the totality of the circumstances, it achieves the purposes of § 3553(a). See id. at 1191. We may apply a presumption of reasonableness to a sentence within the guidelines range. See id. at 1190. The onus of demonstrating that a sentence is unreasonable lies on the party challenging the sentence. See United States v. Amedeo, 487 F.3d 823, 832 (11th Cir. 2007).

1. Minor Role Reduction

Diaz first contends the district court erred in denying his request for a minor role reduction. He argues that his role as a broker meant he did not control or exercise authority over others, or perform functions vital to the criminal conduct.

We review a district court's factual determination regarding a defendant's role in an offense for clear error. See United States v. De Varon, 175 F.3d 930, 937 (11th Cir. 1999) (en banc). Under the sentencing guidelines, a district court may decrease the offense level by two if the defendant was a minor participant in the criminal activity. U.S.S.G. § 3B1.2(b) (2009). A minor participant means someone "who is less culpable than most other participants, but whose role could not be described as minimal." Id., comment. (n.5). The defendant bears the burden of

---

(5) any pertinent policy statement . . .;
(6) the need to avoid unwarranted sentence disparities . . .; and
(7) the need to provide restitution to any victim of the offense.

18 U.S.C. § 3553(a) (2009).

proving his minor role by a preponderance of the evidence. De Varon, 175 F.3d at 939.

The district court's factual determination that Diaz played a major role as "an active broker" in the crimes is not clearly erroneous. R14 at 13-14. Diaz was held accountable for the seven kilograms of cocaine that Zapada agreed to sell to DeBernard. The evidence at trial established that Diaz communicated with Crespo-Dones and Zapada about the transaction, secured DeBernard as the buyer, arranged the details of the exchange, attended the drug meeting, verified the purchase money, and negotiated the terms for the final sale. Without Diaz, it is doubtful that the drug transaction would have even occurred. The district court correctly denied a minor role reduction.

2. Departure for Diminished Capacity

Diaz next maintains that he was entitled to a downward departure for diminished capacity pursuant to U.S.S.G. § 5K2.13, which provides that a court may depart below the applicable guideline range if the defendant committed the offense while suffering from a significantly reduced mental capacity which contributed substantially to the commission of the offense. See U.S.S.G. § 5K2.13 (2009). According to Diaz, his age, education, employment record, severe motorcycle injuries, and minor role in the offenses rendered his case atypical, such

19

that he was entitled to a downward departure for diminished capacity under <u>Koon v.</u> <u>United States</u>, 518 U.S. 81, 116 S. Ct. 2035 (1996).[3]

We lack jurisdiction to review the district court's denial of a downward departure in this case. Unless the district court incorrectly believed that it lacked the authority to grant a downward departure, we have no jurisdiction to review its decision. <u>See</u> <u>United States v. Dudley</u>, 463 F.3d 1221, 1228 (11th Cir. 2006). Here, the district court rejected a downward departure because it found that "while [Diaz] had an unfortunate accident, there is no indication that it led to a diminished capacity or that it really played any role in this offense." R14 at 14. The record thus reflects the district court recognized its authority to make a downward departure but found that the facts did not warrant one. Accordingly, we lack jurisdiction to review the district court's decision. <u>See</u> <u>Dudley</u>, 463 F.3d at 1228.

3. Consecutive Sentence

Diaz argues that the district court erred in ordering that his sentence on count three, for violating 18 U.S.C. § 924(c), should run consecutively to his sentences for his drug offenses in counts one and two.

Diaz's argument is foreclosed by our decision in <u>United States v. Segarra</u>,

---

[3] In <u>Koon</u>, the Supreme Court instructed that before a district court may depart downward, it must first find the case contains aspects "unusual enough for it to fall outside the heartland of cases" in the Sentencing Guidelines. 518 U.S. at 98, 116 S. Ct. at 2046.

582 F.3d 1269 (11th Cir. 2009) (per curiam), petition for cert. filed, (U.S. No. 09-8536) (Jan. 8, 2010). In Segarra, we concluded that the plain language of 18 U.S.C. § 924(c) requires consecutive sentences for a defendant convicted of a § 924(c) offense and an underlying drug crime. See id. at 1272-73. Accordingly, the district court correctly imposed a consecutive sentence for Diaz's § 924(c) conviction.

4. Obstruction of Justice Enhancement

Diaz also challenges the district court's application of a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. He contends the enhancement categorically violated his Sixth Amendment right to a jury trial under Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), and his Fifth Amendment right to a grand jury indictment and due process, because the enhancement was never presented to the jury so there was no jury verdict that found Diaz significantly hindered the prosecution. Additionally, Diaz submits there was insufficient evidence to support the enhancement.

The record reflects that Diaz initially informed the court in November 2007 that he was under medical treatment for brain damage from a past accident and was experiencing problems understanding his attorney. R6 at 2-5. However, the results of a government-sponsored mental examination revealed that he was malingering and was competent to stand trial. R1-44, 86, 94; R11 at 3. In March 2008, Diaz

21

decided to plead guilty to counts one and three of the indictment. R1-64. At his plea hearing, both Diaz and his attorney testified that any medicines Diaz was taking related to his prior motorcycle accident did not adversely affect his ability to communicate with his attorney or make decisions. R7 at 31-32, 37-38. Diaz further acknowledged that he was pleading guilty of his own free will because he was in fact guilty. Id. at 38. Prior to sentencing, however, Diaz moved to withdraw his plea, stating that he was coerced into pleading guilty, he was mentally ill, and he was innocent by reason of insanity. R1-70. Based on the agreement of the parties, the court permitted Diaz to withdraw his plea and set the case for trial. R1-82.

Diaz then filed notice of his intent to assert an insanity defense, which resulted in a second court-ordered mental evaluation and multiple postponements of trial. R1-88, 90. The second evaluation confirmed that Diaz was malingering and had no serious mental defect. R11 at 3. Additionally, an examination by Diaz's own expert concluded that Diaz was not insane at the time of the offense, that he understood the nature and quality of his criminal behavior, and that his crimes were not a result of a mental defect. R1-94 at 2. Based on that report, Diaz's attorney conceded that "at the time of the incident [Diaz] was competent and knew what he was doing." R11 at 4. Trial finally commenced in January 2009.

At his sentencing hearing, the government argued that Diaz had obstructed

22

justice by feigning mental illness and by committing perjury at trial concerning his alleged mental impairments. R14 at 19-20. Christopher Whitley, Special Agent with the Drug Enforcement Administration, testified over objection that DeBernard told him that several months after Diaz's arrest, Diaz informed DeBernard that "there was no way to get out of this other than to tell them that he had a mental illness." Id. at 17. After hearing arguments by both parties, the district court concluded that an enhancement was warranted. Id. at 24. The court explained its decision as follows:

> Okay. I'm persuaded by the Government's argument and will enhance by two levels. I rarely have enhanced for obstruction when a defendant goes to trial and testifies because I don't want to be in the position of punishing a defendant for exercising his constitutional right to go to trial. The only times really I do that is when they manufacture evidence, get somebody else to lie for them, come up with – make up documentation, that sort of thing that goes beyond just testifying.

> In this case I think the defendant did go beyond that. First, he – according to the reports, the two doctors or the doctors at the FDC did determine that he was malingering. They gave him the test. It is very apparent as you read those reports that he basically was trying to present himself as being mentally ill and hurt in this motor vehicle accident. When found to be competent, he changed his plea. I went through the plea colloquy. He was fine. I frankly would not have allowed him to withdraw that plea but for the position that the Government took. The Government agreed to set aside the plea for him to go to trial. I thought he was competent at the time, wouldn't have let him do that, but I acceded to the parties['] advice on that. He went to trial. I should say he also wrote a letter to me which going through the file – where he talks about how he said he was mentally ill, that his lawyer was involved with a conspiracy with – his previous

lawyer was involved with a conspiracy with the prosecution, all this about his accident and how he doesn't have his memory. And he was then examined in terms of his insanity defense, found not to qualify for that both by the Government's lawyer and the defense lawyer, and then his testimony at trial about – that is set forth in the Government's memorandum on Page 5 where he talked about the voices and all of that was just plainly unbelievable and was clearly for the purpose of trying to convince the jury that he had mental problems that he really didn't have. And so for those reasons I think this case does require an enhancement for obstruction.

Id. at 24-25.

With respect to Diaz's constitutional challenges to the enhancement, our review is limited to plain error because Diaz did not raise a Sixth or Fifth Amendment violation in the district court. See United States v. Zinn, 321 F.3d 1084, 1088 (11th Cir. 2003) (explaining that a defendant must "*clearly* articulate a specific objection during sentencing" in order to preserve the objection for appeal). No error, plain or otherwise, has been shown. In Blakely, the Supreme Court applied the rule announced in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000): "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Blakely, 542 U.S. at 301, 124 S. Ct. at 2536. The Court held in Blakely that the petitioner's Sixth Amendment right to a jury trial was violated when the court imposed a sentence beyond the statutory maximum based on a judicial determination that the petitioner

24

acted with "deliberate cruelty," a finding that was neither admitted to by the petitioner nor found by a jury. Id. at 303-05, 124 S. Ct. at 2537-38. Blakely is inapposite here, however, because Diaz was not sentenced beyond the statutory maximum that applied based on the jury's verdict. As our precedent establishes, "an Apprendi constitutional error occurs *only* where a defendant is sentenced beyond the statutory maximum for the offense." Underwood, 446 F.3d at 1345. Consequently, where a defendant's sentence falls below the statutory maximum term of life imprisonment for a conviction under 21 U.S.C. § 841(b)(1)(A), there can be no Apprendi error. See id. Here, the jury convicted Diaz of violating § 841(b)(1)(A) in counts one and two, and the court sentenced him to concurrent terms of 160 months of imprisonment. As Diaz's sentence was below the statutory maximum, he cannot establish that the district court committed plain error. See id.

Furthermore, in accordance with the Supreme Court, we have recognized that "the use of extra-verdict enhancements in an advisory guidelines system is not unconstitutional." United States v. Chau, 426 F.3d 1318, 1323 (11th Cir. 2005) (per curiam) (quotation marks and citation omitted). Consequently, the district court did not plainly err in applying the obstruction of justice enhancement.

As for Diaz's second argument, that there was insufficient evidence to support the enhancement, we review the district court's factual findings for clear

error and the application of the sentencing guidelines de novo. United States v. Uscinski, 369 F.3d 1243, 1246 (11th Cir. 2004) (per curiam). U.S.S.G. § 3C1.1 permits a two-level enhancement to a defendant's offense level if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and "the obstructive conduct related to the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1 (2009).

We have previously upheld the application of a § 3C1.1 enhancement where a defendant feigned amnesia and his malingering postponed his trial for a year, forcing the government to waste time and resources to evaluate his competency. See United States v. Patti, 337 F.3d 1317, 1325 (11th Cir. 2003). We noted that "feigning incompetency, whether to create doubt as to his competency so as to prod his attorney into requesting competency hearings or to convince the court that he cannot stand trial, will trigger a § 3C1.1 enhancement." Id. (quotation marks and citation omitted). Additionally, an enhancement is justified if a defendant commits, suborns, or attempts to suborn perjury. U.S.S.G. § 3C1.1, comment (n.4(b)). Perjury, for purposes of § 3C1.1, means willfully giving false testimony under oath "that, if believed, would tend to influence or affect the issue under determination."

26

United States v. Singh, 291 F.3d 756, 763 (11th Cir. 2002) (quotation marks and citation omitted).

The district court did not clearly err in finding that Diaz obstructed or impeded justice by feigning a mental illness. At various stages throughout the proceedings, Diaz represented that he suffered from a mental infirmity. Diaz's representations resulted in two court-ordered psychiatric evaluations, both of which concurred that Diaz was malingering. Even Diaz's own expert agreed that Diaz understood the criminal nature of his actions and that his crimes did not result from any mental defect. As in Patti, Diaz's malingering wasted government resources and needlessly delayed the prosecution of his case for over a year. The district court correctly applied the obstruction of justice enhancement on this basis.[4] See Patti, 337 F.3d at 1325.

Moreover, the enhancement was also justified based on the district court's finding that Diaz purposefully gave false testimony at trial regarding his mental health. At trial, Diaz testified that "[w]hen there are three or more voices, I can't

_____

[4] Diaz contends that the district court erroneously relied on the hearsay testimony of Agent Whitley that Diaz told DeBernard he would pretend to be mentally ill. A district court may rely upon hearsay evidence at sentencing if: (1) it is reliable, (2) the court makes explicit findings of fact as to credibility, and (3) the defendant is allowed to rebut the evidence. See Patti, 337 F.3d at 1326. While the sentencing transcript does not indicate that the court explicitly found Agent Whitley to be credible, the district court did not expressly rely on Agent Whitley's testimony as a basis for applying the enhancement. Given that sufficient additional evidence supports the district court's stated reasons for the enhancement, we need not determine whether an error occurred.

27

understand what they're saying." R11 at 243. Diaz further stated his brain shuts down, the voices become whispers, he feels dizzy, and he cannot fully understand anything because he has not really heard it. Id. at 243, 252. The district court had the opportunity to view and hear Diaz but found this testimony "plainly unbelievable." R14 at 25. This credibility finding is entitled to due deference. See Singh, 291 F.3d at 763-64. Moreover, Diaz's testimony stands in stark contrast to Zapada's testimony that Diaz actively participated in conversations involving three or more people. Diaz's testimony also directly contradicts the medical reports that he has no mental defect or inability to comprehend the nature of his actions. Indeed, based upon the report by Diaz's expert, Diaz's counsel acknowledged that "it would be disingenuous for me to put Dr. Toomer on the stand and go forward with him to try and illicit testimony from him that my client, you know, is either not competent now or did not know what he was doing at the time of the offense." R11 at 5. The record thus supports the district court's determination that Diaz's testimony was "clearly for the purpose of trying to convince the jury that he had mental problems that he really didn't have." R14 at 25. Accordingly, we affirm the district court's application of the obstruction of justice enhancement.

5. Substantive Reasonableness of the Sentence

In addition to the putative procedural errors discussed above, Diaz also

28

challenges the substantive reasonableness of his sentence. He contends that his mental health, lack of prior convictions, and his minor role in the crimes constituted extraordinary mitigating circumstances which warranted a variance below the sentencing guidelines range. Consequently, he submits that the district court imposed a sentence that was greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a).

We disagree. As previously noted, we review the substantive reasonableness of a sentence for an abuse of discretion. See Pugh, 515 F.3d at 1190. Even if we reasonably conclude that a different sentence is appropriate, we may not reverse unless we possess a "definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors." Id. at 1191. No clear error of judgment exists here. The district court stated that it based its sentence upon consideration of the parties' statements, the pre-sentence report, the criminal history category, the advisory guidelines range of 151 to 188 months, all the § 3553(a) factors, including the seriousness of the crime, and the consecutive nature of the sentence on count three. R14 at 29-30. Diaz's sentence of 160 months of imprisonment on counts one and two falls within the guidelines range and is therefore subject to a presumption of reasonableness. See Pugh, 515 F.3d at 1190. Though he suggests that certain mitigating factors should have received greater

weight than the court accorded them, we "will not substitute our judgment in weighing the relevant factors." Amedeo, 487 F.3d at 832 (quotation marks and citation omitted). The district court fashioned a reasonable sentence that comported with the sentencing purposes of § 3553(a). No abuse of discretion has been shown.

## III. CONCLUSION

Diaz challenges his convictions and sentences on direct appeal. We conclude that there was sufficient evidence to support each conviction, that the district court's challenged evidentiary rulings were not individually or cumulatively erroneous, and that Diaz's sentence is both procedurally and substantively reasonable. Accordingly, we AFFIRM his convictions and sentences.

**AFFIRMED.**